IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEBORAH ANN PACKER,            )
                               )
         Plaintiff,            )
                               )
v.                             )   CIVIL ACTION NO. 11-00084-CG-N
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security, )
                               )
         Defendant.            )

REPORT AND RECOMMENDATION

Plaintiff Deborah Ann Packer ("Packer") filed this action seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that she was not entitled to disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401-433 and 1381-1383c, respectively.[1]  This action has been referred to the undersigned Magistrate Judge for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Further, plaintiff's unopposed motion to waive oral arguments (doc. 19) was granted on April 16, 2012 (doc. 20).  Upon consideration of the administrative record (doc. 15), and the parties' respective briefs (docs. 16 and 17), the undersigned recommends that the decision of the Commissioner be **REVERSED** and **REMANDED**.

I.    Procedural History.

_____

[1] All references to the U.S.C. (United States Code) are to the 2006 edition.

On February 12, 2009[2], Packer filed applications for DIB and SSI benefits, alleging disability since November 19, 2008, due to stress and problems with her back and legs.[3] (Tr. 134, 141, 154).  The applications were denied on May 21, 2009 (Tr. 92). Packer timely requested a hearing before an Administrative Law Judge ("ALJ") on June 23, 2009.  (Tr. 98).  Following a hearing on June 14, 2010 (Tr. 32-63), the ALJ entered an unfavorable decision on June 16, 2010 (Tr. 14-27).

The Appeals Council denied review of the ALJ's decision on December 22, 2010 (Tr. 1-3), making the ALJ's decision the final administrative decision for purposes of judicial review.  *See* 20 C.F.R. §§ 404.981, 416.1481.[4]

II.   Issues on Appeal.

1.   Whether the ALJ's residual functional capacity assessment is supported by the medical opinion of a treating or examining medical source.

2.   Whether the ALJ erred by failing to find that Packer suffers from the additional severe impairments of degenerative joint disease of the right knee and varicose veins.

---

[2] A "protective filing" date of January 21, 2009, is also indicated in the record. (Tr. 149).

[3] Packer previously filed applications for DIB and SSI on August 1, 2006, alleging disability beginning July 20, 2006. On November 19, 2008, an Administrative Law Judge (ALJ) denied these claims (Tr. 64-74). Packer requested review of the ALJ's decision, which the Social Security Appeals Council denied on October 16, 2009 (Tr. 76-78). Packer did not pursue these claims thereafter.

[4] All references to the Code of Federal Regulations (C.F.R.) are to the 2011 edition of part 404, which addresses claims under Title II of the Act.  All cited regulations have parallel citations in part 416, which addresses claims under Title XVI of the Act.

III.     Standard of Review.

     A.     Scope of Judicial Review.

     In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).   *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792

F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

     B. Statutory and Regulatory Framework.

   The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).  The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[5]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

---

[5] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. Id. It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"),or hear testimony from a vocational expert (VE). Id. at 1239–40.

IV.   Relevant Facts.

1.   Packers's vocational background.

Packer was born on June 19, 1966. (Tr. 37).  She was almost 44 years old on June 16, 2010, when the ALJ issued her unfavorable decision (Tr. 27, 37).  She completed the 10th grade (Tr. 39), and last worked in 2006 as a "beautician." (Tr. 40)[6].  During that

---

[6] Although her official earning records indicate no earnings after 2005 (Tr. 145), Packer testified that she worked as a beautician from "[19]87 to 2006." (Tr. 41).  The job required "long
(Continued)

same time period, Packer also worked for "two janitorial companies at one time." (Tr. 42).  In conjunction with one of those jobs, Packer worked as a housekeeper "at someone's home." (Tr. 41).  In conjunction with the other job, Packer testified that she cleaned a bank and an office (Tr. 42).   Her past work experience also included jobs as a fast food worker and a telephone solicitor.  (Tr. 59).

2.   <u>Medical Evidence</u>.

On November 22, 2007, Packer was involved in a motor vehicle accident ("MVA"). (Tr. 230).  On January 4, 2008, she presented to the Stanton Clinic for a follow-up appointment with complaints of back pain and migraine headaches.  (Tr. 330).  She also complained that the Motrin and Flexeril prescribed earlier were making her drowsy; she asked that the medicine be "switched." (Tr. 330).  Upon examination, she was found to be "alert and oriented x 3" and to have normal strength, reflexes and intact sensations in all of her extremities. (Tr. 231).  The examining physician assessed Packer as having persistent musculoskeletal pain and migraine headaches.  (Tr. 231).  Anti-inflammatory medications and Imitrex (medication for migraine headaches) were prescribed.  (Tr. 231).

On September 5, 2008, Packer presented herself to Cardiovascular Consultants, P.C., for evaluation of her varicose veins.  (Tr. 221).  It was noted she had "a lot of superficial disease in both lower extremities." When she stood, she was "markedly

---

periods of standing from 8:00 or 9:00 in the a.m. until sometime, 1:00 and 3:00 in the evening without really just resting." (Tr. 41).

symptomatic." It was noted that "not all of her symptoms sounded like they were venous in nature," but she might have "some degree of restless leg syndrome," and compression therapy was recommended (Tr. 221).  The records also indicate that Packer failed to show for two follow-up appointments scheduled with Cardiovascular Consultants on September 19 and 30, 2008 to "see how she is doing with compression therapy."  (Tr. 221).

Packer returned to the Stanton Clinic on September 15, 2008 with complaints of low back and pain in both knees after falling the previous day[7].  (Tr. 226).   She reported that the pain was 6 on a scale of 1 to 10.  (Tr. 226).  ).   Upon examination, she was found to be "alert and oriented x 3" and to have normal strength, reflexes and intact sensations in all of her extremities. (Tr. 227).  The examining physician assessed Packer as having Lumbar spine and bilateral knee pain and restless leg syndrome. (Tr. 227).  Naproxen (a nonsteroidal anti-inflammatory drug) and Flexeril (a muscle relaxant) were prescribed and an x-ray was ordered "to eval[uate] for osteoarthritis." (Tr. 227).  On September 22, 2008, an x-ray of Plaintiff's right knee showed "[d]egenerative changes within the knee joint."[8] (Tr. 232).

---

[7] According to the office notes, Packer slipped in water and fell down (Tr. 226).  She denied that her fall was caused by the lightheadedness she was experiencing (Tr. 226).

[8] Specifically, the findings on x-ray of Packer's right knee were as follows: "There are calcifications superior to the tibial tuberosity which may represent enthesopathy.  The cortex of the posterior patella is irregular, and there is a decrease in the patellofemeral joint space.  The bones, joints and soft tissue are otherwise within normal limits.  There is no evidence of fracture or dislocation."  (Tr. 232).

In January 2009, Packer underwent a total abdominal hysterectomy and bilateral salpingo-oophorectomy surgery for chronic pelvic pain and menometrorrhagia.[9] (Tr. 233).  She was admitted on January 12, 2009 and discharged on January 14, 2009 (Tr. 233). Her postoperative course was described as "uncomplicated."  (Tr. 233).  She was ambulating and tolerating a regular diet at the time of discharge and was give prescriptions for Tylox, Premarin, Pepcid and iron.  (Tr. 233).   She was instructed to return in one week for the removal of her staples and in two weeks to see the doctor.  (Tr. 234).

On January 13, 2009, Plaintiff underwent treatment for lower back pain, a sore throat, and headaches. Lumbar disc syndrome, fatigue, insomnia, left ear pain, cephalgia, knee pain, and obesity were diagnosed and medications, including Lortab (a narcotic) were prescribed (Tr. 288).

On February 10, 2009, Packer presented to Dr. Scott Carver with complaints of low back pain.  (Tr. 247).  Dr. Carver found she had right lumbar paraspinal muscle tenderness, a questionable positive straight leg raising test on the right, no atrophy, and normal reflexes. (Tr. 247).  Dr. Carver diagnosed lumbar disc syndrome and opined that Packer needed to see a neurosurgeon.  Dr. Carver then refilled Packer's prescriptions for Lortab and Mirapex (medication used to treat restless leg syndrome). (Tr. 247).

---

[9] Menometrorrhagia is a condition in which prolonged or excessive uterine bleeding occurs irregularly and more frequently than normal.

On May 11, 2009, Packer presented to Dr. Alan Sherman for a consultative examination at the request of the Commissioner. (Tr. 272). Packer reported that she applied for disability benefits primarily due to low back and shoulder blade pain. (Tr. 272). She reported having had two automobile accidents with the last one occurring two years ago (2007), leg pain, and varicose veins. (Tr. 272). Dr. Sherman examined Packer and found that while she had a full range of motion in her neck, back and all her extremities, she complained of pain and stiffness with both full extension and full flexion of her back. (Tr. 273). She had no obvious spasms in her back, but had some stiffening over her rhomboid areas. (Tr. 273). Dr. Sherman found some mild varicose veins primarily in Packer's right lower leg. (Tr. 273). She had normal gait, station, squat and heel-toe walking. (Tr. 273). Neurologically, Dr. Sherman found that Packer had good extremity motor strength, normal sensation and reflexes (except for mildly diminished reflexes in her patellar regions), and normal grips (Tr. 273); she also had a positive straight leg raising test, but no manipulative limitations or atrophy. (Tr. 273). A lumbar spine x-ray was normal. (Tr. 273, 275). Dr. Sherman's diagnoses included: chronic lumbar pain, thoracic pain, history of varicose veins primarily in her right leg, environmental allergies, history of depression, restless leg syndrome, and acid reflux. Dr. Sherman suggested that Packer had "some definite stiffening of the muscles which could probably be relieved with some mild chiropract[ic] or physical therapy" and he "d[id] not see a major cause for [Packer] to be considered disabled" (Tr. 274).

On May 12, 2009, Packer was examined by Annie Formwalt, Psy.D., a clinical psychologist, at the request of the Commissioner. (Tr. 250). Packer reported that she

was unable to work due to back and leg problems. (Tr. 250).  She complained of depression for "about a year," stress from her medical problems, and medication side effects. (Tr. 250).  She reported that she stopped working because she could not handle the job, her pain, and she was "unsatisfied with the pay." (Tr. 250).  She admitted to an arrest for fraudulent use of a credit card and past alcohol abuse. (Tr. 250).  Dr. Formwalt found Packer's grooming and personal hygiene to be good and her affect to be normal, although she appeared anxious and mildly depressed.  (Tr. 250).  Dr. Formwalt  did not observe any gross or fine motor impairments.  (Tr. 250).   Packer was alert and oriented and could subtract serial threes from 20 and count backwards from 20 to one; spell the word "world" forward and backward; and recall three of three words immediately and two of three words after five minutes.  (Tr. 251). She could work only one of three problems related to making change, but stated that she was "having difficulty concentrating." (Tr. 251).  According to Dr. Formwalt, Packer had an adequate fund of knowledge, grossly intact thought processes, fair insight, poor judgment, and low average intelligence.  (Tr. 251).  Packer reported her daily activities to include cooking sometimes, watching television, listening to music, spending time with friends, going to church once per week, and reading magazines and novels.  (Tr. 251)  Dr. Formwalt diagnosed depressive disorder not otherwise specified and Lortab dependence but opined that it was likely that, within the following six to twelve months, Packer would have a favorable response to treatment, including psychotherapy (Tr. 251).

On May 13, 2009, Donald Hinton, Ph.D., a state agency psychologist, reviewed the evidence and found Packer's mental impairments resulted in a mild restriction of

activities of daily living, moderate difficulties in maintaining social functioning,

concentration, persistence, and pace, and no episodes of decompensation (Tr. 253-63).

He found that Packer's ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods was not significantly limited.

(Tr. 268).  Dr. Hinton found Packer could understand, remember, and carry out short and

simple instructions and concentrate and attend for reasonable periods of time.  (Tr. 269).

He also concluded that contact with the general public should not be a usual job duty for

Packer.  (Tr. 269).

On January 13, 2010,[10] Packer presented to Dr. Janovski with complaints of lower

back pain, a sore throat for about four days, left ear pain, and headaches every other day

for a couple of weeks. (Tr. 288).  She also reported being nauseated every morning when

she gets up and feeling very tired with no energy.  (Tr. 288).  She also said that she

wanted to try a diet plan. (Tr. 288).  Packer was diagnosed with lumbar disc syndrome,

fatigue, insomnia, left ear pain, cephalgia (i.e. headache), knee pain, and obesity.  (Tr.

288) Treatment included Lortab (a narcotic), Restoril (sleep medication), and antibiotics.

(Tr. 288).

On February 1, 2010, Packer presented to Andrea Pitts, a nurse practitioner, with

complaints of depression and bloody stools. Ms. Pitts assessed Packer as presenting with

---

[10] Although this treatment note is dated "01/13/09" in the column designated for the
"DATE," the note also bears a stamp with the date "1-13-10" (Tr. 288).  The note would also be
inconsistent with the records concerning Packer's hospitalization for a hysterectomy from
January 12 to 14, 2009 (Tr. 233-234).

melena (black, tarry stools), blood pressure elevation (150/90), constipation, menopausal disorder ("hot flashes are still bothersome"), familial hypercholesterolemia, obesity and seasonal pattern depression (Tr. 304-06). Ms. Pitts' physical examination of Packer revealed a normal musculoskeletal system, normal cranial nerve function, no sensory or coordination abnormalities, and no motor dysfunction. (Tr. 305). Packer returned on February 2, 2010, to have a "CBC test with differential" and "Hemoglobin level" blood test preformed. (Tr. 305-06). These blood test results were all within normal limits. (Tr. 307-09).

It is unclear whether Packer returned to Dr. Janovski on February 8, 2010. The record contains a "Pain Questionnaire" containing a handwritten note "D. Packer 2/8/2010," which reports pain of 8 on a scale of 0 to ten. (Tr. 289). Neither the source nor the nature of the pain is described beyond checkmarks beside the following terms: "aching"; "stabbing"; "tender"; "tiring"; "numb"; "weakness"; and "tingling." (Tr. 289). Although this questionnaire was used in conjunction with other office visits by Packer to Dr. Janovski, the record contains no office note by Dr. Janovski concerning any examination or visit by Packer on February 8, 2010.

On March 7, 2010, Packer presented to the emergency room at Springhill Medical Center with complaints of shortness of breath, fatigue, and heart palpitations, which she associated with the diet medication she was taking. (Tr. 299). Dr. John McMahon examined Packer and found her to be alert, oriented and in no apparent distress. (Tr. 300). Dr. McMahon also found that she had a symmetrical, non-tender back and full range of motion in all extremities with no bony tenderness. (Tr. 300). An

electrocardiogram was taken and tests were performed to determine Packer's blood gases and basic metabolic panel; results of all were normal.  (Tr. 302). Dr. McMahon diagnosed palpitations, probably secondary to diet medications (Tr. 300).  Packer was discharged with instruction to follow up the next day with Cardiology Associates for a Holter monitor placement.[11]  (Tr. 300).

On April 5 and May 4, 2010, Packer sought treatment for lower back and left leg pain. Lumbar disc disease, high cholesterol, gastroesophageal reflux disease, obesity, depression, and insomnia were diagnosed and medications, including Lortab, Lexapro (an antidepressant), Lyrica (medication for neurotic pain), and Celebrex (anti-inflammatory) were prescribed (Tr. 310, 312).

3.    Packer's Testimony.

At an administrative hearing held on June 14, 2010, Packer testified she had a previous felony conviction in 2004 or 2005 for credit card fraud (Tr. 40). She testified she stopped working in 2006 due to leg and back pain (Tr. 40-41), and that she experienced back pain every day for at least several hours, but stated that the pain eased with medications (Tr. 45-46).  Packer testified that the effects from the medication forced her to lay down for approximately five hours a day (Tr. 47).  She testified that she could walk for maybe 20 minutes, stand for ten to 15 minutes, sit for 20 to 30 minutes, and lift 20 to 30 pounds (Tr. 48-50). She reported depression and difficulty understanding things

---

[11] In medicine, a Holter monitor (often simply "Holter" or occasionally ambulatory electrocardiography device) is a portable device for continuously monitoring various electrical activity of the cardiovascular system for at least 24 hours (often for two weeks at a time).

(Tr. 50).

Packer testified that she went out to eat with friends and had no problems getting along with people.  She reported that she washed her own laundry (Tr. 52), grocery shopped about twice a month, and attended church every other week (Tr. 53).  Packer also stated that she was able to watch television (Tr. 54), read books and magazines, and use the internet (Tr. 54-55).

### 4.   Vocational Expert's Testimony.

The ALJ asked Richard Freeman, a vocational expert, to describe Packer's past work in terms of the exertional and skill level of each job.  Mr. Freeman testified that Packer's work as a cosmetologist (DOT 332.271-010) is classified as "light" and "semi-skilled" with an "SVP six." (Tr. 59).  Her work as a maid (DOT 323.687-014) and as a fast food worker (DOT 311.472-010) are each "light" and "unskilled" with an "SVP two."  (Tr. 59-60).  Her job as a telephone solicitor (DOT 299.357-010) is classified as "sedentary" and "semi-skilled" with an "SVP three."  (Tr. 60).

The ALJ presented a hypothetical to Mr. Freeman which included an individual of Packer's age, education, and work experience who was limited in the following fashion:

> Lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently, would need a sit/stand option but would not need to leave the work station, no more than occasional of the postural activities of climbing stairs, bending, stooping, kneeling, crouching, and crawling, and no work place hazards, no climbing ladders, scaffolds, or ropes, no work around unprotected heights or dangerous equipment.  No more than rarely . . . . operation of foot controls, [] and no work in temperature extremes.

(Tr. 60).  The ALJ asked Mr. Freeman's opinion about whether such a hypothetical individual could perform any work that Packer performed in the past.  Mr. Freeman

testified that the "sit/stand option would preclude [Packer's] past work." (Tr. 60).

The ALJ then asked Mr. Freeman if there were "any jobs in the region or in several regions in the country that an individual with the same work history as Ms. Packer . . .[was] able to perform." (Tr. 60). In response to this question, Mr. Freeman testified:

> I have a representative sample of four jobs beginning with information clerk. DOT is 237.367-018. This is light work. It's unskilled with an SVP two. Nationally, jobs exceed 950,000. That would include storage facility rental clerk. DOT is 295.367-026. This is light work. It's unskilled with an SVP two. Nationally, jobs would exceed 800,000. Or include parking lot attendant. DOT is 915.473-010. This is light work. It's unskilled with an SVP two. Nationally, jobs would exceed 650,000. Lastly, I would include office helper. DOT is 239.567-010. This is light work. It's unskilled with an SVP two. Nationally, jobs would exceed 900,000.

(Tr. 61). Mr. Freeman also provided local/regional numbers of in excess of 19,000 for information clerk; 16,000 for the storage facility rental clerk; 13,000 for the parking lot attendant; and 18,000 for the office helper. (Tr. 61). Although "DOT does not specifically identify a sit/stand option" (Tr.61), Mr. Freeman testified that his placement of the hypothetical individual in these jobs with the sit/stand option "is consistent with the DOT" (Tr. 62).

The ALJ proposed another hypothetical that incorporated her first hypothetical but added "a need to lie down during the day anywhere from three to five hours and that would be two to three days a week." (Tr. 62). Mr. Freeman testified that there would be no work for such an individual.

5.    ALJ's Decision.

The ALJ followed the five-step sequential evaluation mandated by the regulations

for determining disability. See 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Packer had not engaged in substantial gainful activity since her alleged onset date of November 19, 2008.  (Tr. 16).  At step two, the ALJ found that, within the meaning f 20 C.F.R. §§ 404.1571 and 416.971, *et seq.*, Packer had severe impairments of degenerative disc disease of the lumbar spine and depression. (Tr. 16-18).[12]  At step three, the ALJ found that Packer did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 19).[13] The ALJ concluded that Packer had the residual functional capacity for a range of light work,[14] which incorporated the following limitations:

- Allowed for a sit/stand option; and
- Did not require

---

[12] The ALJ explained in detail her reasons for rejecting any contention that the following medical issues constituted severe impairments: Packer's one episode of cardiac arrhythmia was caused by the side effect of a particular medication; her obesity which did not limit her capacity to function; her occasional headaches which resolved with medication; treatment records were sparse concerning joint pain and even less as to gout; elevated blood pressure was only sparsely reflected in the treatment records; reflux responded to prescribed treatment; hormone treatment following hysterectomy did not limit her functioning; high cholesterol did not limit her function; restless leg syndrome was neither a recurrent diagnosis nor subject to present prescribed medications (Tr. 16-18).

[13] The ALJ discounted Packer's degenerative disc disease on the grounds that it was "not found to have resulted in compromise of the nerve root or spinal cord." (Tr. 19).  The ALJ supports this finding by citing the lumbar x-ray taken at the request of the examining consultant, Dr. Sherman that showed "no obvious problems" and was, in the radiologist's opinion, "negative."  (Tr. 19, *citing* Tr. 271-275).  The ALJ also concluded that Packer's mental impairments did not meet the criteria of listing 12.04 because she did not have marked limitations in either her activities of daily living, her social functioning, or in her concentration, persistence or pace; nor has she experienced any episodes of decompensation.  (Tr. 19-20).  The ALJ also noted that Packer's depression "has received minimal documentation." (Tr. 20).

[14] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

- Operation of foot controls;
- Climbing of ladders, ropes, or scaffolds;
- Exposure to unprotected heights, dangerous equipment, or temperature extremes;
- Complex or detailed instructions; and
- More than occasional

  - Climbing of stairs or ramps;
  - Bending;
  - Stooping;
  - Kneeling;
  - Crouching; or
  - Crawling

(Tr. 20-25).

At step four, the ALJ found Packer could not perform any of her past relevant work (Tr. 25). At step five, the ALJ found, based upon the vocational expert's response to the ALJ's hypothetical questions, that Packer could perform other work existing in significant numbers in the national economy, including the jobs of information clerk, storage facility rental clerk, parking lot attendant, and office helper (Tr. 26-27). The ALJ thus found that Packer was not disabled (Tr. 27).

V.    Analysis.

**(1)   The ALJ's residual functional capacity assessment is not supported by the medical opinion of a treating or examining medical source.**

Packer argues, in sum, that "[t]he ALJ did not point to any specific evidence, medical or otherwise, which specifically supports the conclusion that [she] can perform ['the exertional requirements of a reduced range of light work, allowing for a sit/stand option as well as other exertion and non-exertion limitations'] on a regular and sustained

basis." (Doc. 16 at 5 and 6). Packer further argues that, to the extent the ALJ relied on

Dr. Sherman's consultative examination[15], this examination was not only performed more

than a year prior to the ALJ's decision but Dr. Sherman gave no opinion about Packer's

specific physical capabilities or limitations. Packer specifically contends that "[Dr.

Sherman] did not complete a residual functional capacities assessment, nor did he

provide a statement that attempted to describe any limitations that Ms. Packer may have

in performing various work-related activities; i.e., sitting, standing, walking, lifting,

carrying, etc." (Doc. 16 at 6).

The Commissioner argues, in sum, that "[t]he ALJ was not required to obtain a

medical opinion from a treating or examining medical source in order to support her

residual functional capacity findings [because] [a] claimant's residual functional

capacity 'is an ***administrative assessment*** of the extent to which an individual's

medically determinable impairment(s), including any related symptoms such as pain, may

cause physical or mental limitations or restrictions that may affect his or her ability to do

---

[15] The ALJ supported her RFC determination in part by the following reference to Dr. Sherman's report:

> Radiological imaging taken at the time of the medical examination revealed normal alignment of the lumbar spine, disc height maintained, and facets normal, with impressions of negative lumbar spine imaging. She was found to have full range of motion of the neck, and while there was some stiffening of the back there was no obvious spasms or deformity and had full range of motion despite complaints of pain and stiffness with full extension nd flexion. Furthermore, neurologically the claimant had good motor strength and while seated leg raise was positive for pain, atrophy was negative and both fine and gross manipulation was intact. Locomotor function provided the claimant had normal gait, normal station, normal squat, and normal heel-toe walk despite the allegations regarding her limited capacity to stand and walk.

(Tr. 22, *citing* Exhibit B10F (Tr. 271-275)).

work related physical or mental activities'."   (Doc. 17 at 9, *quoting*, Social Security

Ruling (SSR) 96-8p, 1996 WL 374184 (July 2, 1996) (emphasis added in

Commissioner's brief).   The Commissioner acknowledges, however, that the regulations

further provide that the ALJ must "assess your residual functional capacity ***based on all***

***of the relevant medical and other evidence***."   (*Id.*, *quoting* 20 C.F.R. § 404.1545(a)(3)

(emphasis added in Commissioner's brief).   The Commissioner argues that the ALJ

properly found that Packer "could perform a range of light work with limitations as noted

above" because she considered all of the evidence, including the following medical

evidence:

> That evidence showed that, in January 2008, Plaintiff was alert and oriented
> and had normal strength and reflexes and intact sensation in all of her
> extremities (Tr. 230-31). In September 2008, she appeared normal, was
> alert and oriented times three, and had intact sensation (Tr. 226-27). In
> February 2009, Dr. Carver found that Plaintiff had no atrophy and normal
> reflexes (Tr. 247). In May 2009, Dr. Sherman found that Plaintiff had full
> ranges of motion in her neck and all of her extremities. She had no obvious
> spasms in her back, only "some" stiffening over her rhomboid areas, full
> ranges of motion in her back, and normal gait, station, and heel-toe
> walking. She had good extremity motor strength and normal sensation and
> reflexes (except for mildly diminished patellar reflexes). She also had no
> manipulative limitations or atrophy and a lumbar spine x-ray was normal.
> Dr. Sherman stated Plaintiff had "some" definite stiffening of the muscles
> which could probably be relieved by "mild" chiropractic or physical
> therapy, but otherwise, he "d[id] not see a major cause for [Plaintiff] to be
> considered disabled" (Tr. 272-75).
>
> In May 2009, Dr. Formwalt found Plaintiff had good grooming and
> personal hygiene, no obvious gross or fine motor impairments, normal
> affect, and only "mild" depressive symptoms. She was alert and oriented
> and could subtract serial threes from 20 and count backwards from 20 to
> one. She could work one out of three problems, spell the word "world"
> forward and backwards, recalled six digits forward and four digits
> backward, and recalled three of three words immediately and two of three
> words after five minutes. She also had adequate fund of knowledge, grossly

intact thought processes, and fair insight. Dr. Formwalt believed that, within six to twelve months, Plaintiff would have a favorable response to treatment, including psychotherapy (Tr. 250-51).

In February 2010, Ms. Pitts [a nurse practitioner] found she had a normal musculoskeletal examination, cranial nerves, sensation, motor functioning, and reflexes (Tr. 304-06). The following month, Dr. McMahon found Plaintiff was alert and oriented with a symmetrical, non-tender back, regular heart rate and rhythm, and full ranges of motion in all of her extremities (Tr. 292-303).

(*Id*. at 10-11).   The ALJ did not, however, indicate that she relied specifically on the physical examination dated January 4, 2008, which was conducted during a follow-up clinic visit following the motor vehicle accident (MVA) Packer was involved in on November 22, 2007(Tr. 230-31). Rather, the examination included merely a checklist affirmation that Packer's extremities had intact sensation but also acknowledged Packer's "persistent MSK [musculoskeletal] pain."  (Tr. 230-31).[16] Nor is there an indication that the ALJ specifically relied on the same checklist affirmation on September 15, 2008 (Tr. 226-27) regarding Packer's "intact sensation" or that she considered the additional diagnosis at that time of both "knee pain & lumbar pain/ spasms." (Tr. 227). [17]

The ALJ did refer to Dr. Carver's diagnosis of "right lumbosacral paraspinal tenderness" and assessment of "lumbar disc syndrome" and that "[n]o atrophy was found

---

[16] The physician who treated Packer during this clinic visit (his name is undecipherable) not only prescribed pain medication but also instructed her to "continue NSAIDS [nonsteriodal anti-inflammatory drugs] & avoid chiropractors."  (Tr. 231).

[17] The physician who treated Packer on September 15, 2008, also diagnosed her as "restless leg syndrome" and prescribed, *inter alia,* nonsteroidal anti-inflammatory drugs and a muscle relaxant.  (Tr. 227).

but the claimant's medications were refilled."  (Tr. 22, *citing* "Exhibit B5F" which is Tr. 243-248).  The ALJ did not, however, acknowledge that Dr. Carver also concluded that Packer "needs to see a neurosurgeon."  (Tr. 247).  Dr. Carver prescribed pain medication in three forms (Lortab, Ibuprofen and Requip) and recommended that Packer have an MRI but noted that she did not have the money to pay for an MRI.  (Tr. 248).

The ALJ's reliance on Dr. Sherman's report (Tr. 271-275) is also problematic.  As Packer points out, Dr. Sherman's examination took place over a year prior to the ALJ's decision and he gave no opinion about Packer's specific physical capabilities or limitations.  In addition, the ALJ's citation to the "negative lumbar spine imaging" (Tr. 22, *referring to* Tr. 275) taken pursuant to Dr. Sherman's order is inconsistent not only with the ALJ's finding that Packer's degenerative disc disease of the lumbar spine is a severe "impairment" but with the numerous medical treatment notes diagnosing lumbar disc disease/syndrome and prescribing narcotic and other prescription pain medications (see e.g. Tr. 284, 287, 288, 310, and 312).  Nor does the ALJ acknowledge the inconsistency between Dr. Sherman's recommendation on May 11, 2009, for chiropractic and physical therapy with the opinion of a treating physician on January 4, 2008, that Packer should "avoid chiropractors" (Tr. 231).

The ALJ similarly extrapolates certain statements from the notes of a nurse practitioner, Andrea Pitts, pertaining to Packer's office visit on February 1, 2010, for depression and blood in her stool (Tr. 304-309), and from Dr. John McMahon's notes pertaining to Packer's emergency room visit on March 7, 2010, with chest pains and shortness of breath (Tr. 291- 303).  The ALJ cites Ms. Pitts' notes for the proposition that

"claimant's musculoskeletal system is found to be normal, and motor examination demonstrated no dysfunction." (Tr. 22, *citing* Exhibit B14F, which is Tr. 304-309). It is unclear, however, upon what basis or to what extent Ms. Pitts declares Packer's musculoskeletal system to be "normal." The ALJ cites to Dr. McMahon's notes for the proposition that "claimant's musculoskeletal condition showed no limitations in range of motion, joint swelling, tenderness, or signs or symptoms of deep vein thrombosis." (Tr. 22, *citing* Exhibit B13F, which is Tr. 291-303). While it is true that Dr. McMahon declared Packer to have "Full range of motion, no bony tenderness" (Tr. 300), he also acknowledged that Packer suffered from, *inter alia*, "Chronic back pain" (Tr. 300).

The ALJ has not, in fact, explained how she specifically arrived at her opinion that Packer could perform "light work" with the limitations imposed solely by the ALJ. The record contains no medical opinion that even attempts to address Packer's residual functional capacity. The Commissioner does not dispute that the only physical capacities assessment contained in this record was completed by a State Agency non-examining, non-physician, reviewing "Medical Consultant" on May 21, 2009 (Tr. 276-83). Because the ALJ added a condition that Packer requires a sit/stand option, cannot operate foot controls, and must only occasionally be required to kneel or crawl (Tr. 20-21), the ALJ's decision is also inconsistent with the assessment of that reviewing medical consultant who opined that Packer could frequently kneel and crawl and did not impose a sit/stand

requirement (Tr. 276-83).[18]  Although it might be argued that the ALJ correctly assumed that Packer needed the more significant limitations, the ALJ's RFC is nonetheless unsupported by any evidence of record.  *See* Morgan v. Astrue, 2010 WL 5376336, *3 (S.D. Ala. Dec. 23, 2010)("[I]t is well established in this Circuit that the opinion of a non-examining, reviewing physician 'is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision'."), *quoting* Swindle v. Sullivan, 914 F.2d 222, 226 n. 3 (11th Cir. 1990).

In Coleman v. Barnhart, 264 F.Supp.2d 1007 (S.D. Ala. 2003), this Court held that:

> The undersigned finds it unclear how the ALJ found plaintiff could meet the threshold physical requirements of medium work, in absence of a physical capacities evaluation ("PCE") completed by a treating or examining physician, particularly in light of plaintiff's numerous severe impairments. This Court has held on a number of occasions that the Commissioner's fifth-step burden cannot be met by a lack of evidence, or by the residual functional capacity assessment of a non-examining, reviewing physician, but instead must be supported by the residual functional capacity assessment of a treating or examining physician. Because no such assessment exists in this case, even though the consultative cardiologist the Social Security Administration sent plaintiff to, Dr. Benjamin Citrin, specifically recommended a stress test to assess functional capacity (Tr. 332; *compare id. with* Tr. 334 (Dr. Citrin did not complete the PCE sent to him by SSA because he felt a stress test need be conducted to assess functional capacity)), this case is due to be remanded for such assessment and any further proceedings not inconsistent with this decision.

---

[18] Another inconsistency in this case involves the ALJ's finding that Packer has only "mild difficulties in social functioning, while Dr. Hinton, a State Agency non-examining, reviewing physician, concluded that she has "moderate" difficulties in maintaining social functioning and in interacting appropriately with the general public." (*Cf.* Tr 24 with Tr. 263 and 268).  The ALJ explains only that Packer's "limitations in engaging in regular social activities were often attributed to her physical condition rather than her mental capacity."  (Tr. 24).

264 F.Supp.2d at 1010-11.  In the present case, Dr. Carver made it clear that Packer

needed to "see a neurosurgeon" and recommended that she have an MRI (Tr. 247-48);

however, the record contains no evidence that either recommendation was followed.

In Casey v. Astrue, 2008 WL 2509030, * 4 (S.D. Ala. June 19, 2008), this Court

held that:

> It should also be noted that the ALJ's reliance upon the consultative
> examination of Dr. L.D. McLaughlin to establish that plaintiff can perform
> the exertional requirements of sedentary work is curious since the family
> practitioner simply stated "I feel that Ms. Brenda Casey is unable to do
> prolonged walking, lifting or carrying objects which she did in her previous
> job due to stated back pain." (Tr. 234) ***Nothing about this statement, by
> implication, establishes that plaintiff can perform the exertional
> requirements of the full range of sedentary work and the ALJ points to no
> RFC evidence of record in support of his conclusion.***[3]
>
>> [FN3]. The ALJ does mention the physical residual functional capacity
>> assessment completed by disability specialist Chris Edwards. (Tr.
>> 236-243) However, the ALJ specifically concluded that plaintiff
>> could perform only sedentary work, as opposed to the light work
>> found by the disability specialist. (Tr. 28) As this Court has
>> previously found, an RFC assessment completed by a disability
>> specialist is entitled to no weight. *Cf.* Swindle v. Sullivan, 914 F.2d
>> 222, 226 n. 3 (11th Cir. 1990) (the opinion of a non-examining,
>> reviewing physician "is entitled to little weight and taken alone does
>> not constitute substantial evidence to support an administrative
>> decision.").
>
> This Court has held on numerous occasions that the Commissioner's fifth-
> step burden must be supported by the residual functional capacity
> assessment of a treating or examining physician. Such an assessment
> particularly is warranted where, as here, the ALJ has rejected the only RFC
> assessment in the record completed by an examining physician (*see* Tr. 354
> (PCE completed by Dr. Joseph Walsh on December 27, 2006)).
> Accordingly, this additional error need be corrected on remand.

2008 WL 2509030 at * 4 (emphasis added).  In the present case, Dr. Sherman makes the

following diagnoses: (1) Chronic Lumbar Pain;  (2) Thoracic Pain;  (3) History of

Varicose Veins primarily in the Right Leg;  (4)  Environmental Allergies;  (5) History of

Depression;  (6)  Restless Leg Syndrome; and  (7) Reflux.   Although he summarily

declares that "I do not see a major cause for Ms. Packer to be considered disabled," (Tr.

274), he did not attempt to assess Packer's specific residual functional capacities related

to such activities as sitting, standing, walking, lifting, carrying, etc., despite the presence

of "definite stiffening of the muscles" in the nature of a condition which requires "mild

chiropractic or physical therapy" (Tr. 274).

        In Catledge v. Astrue, 2010 WL 3211151, *8 (S.D. Ala. July 28, 2010), this

Court also held:

> Although the RFC adopted by the ALJ appears to place more restrictions
> and limitations on the plaintiff than Dr. Crotwell and Dr. Houston have
> imposed, ***there is no medical opinion, either by an examining or non-
> examining medical source which supports the specific restrictions and
> limitations imposed by the ALJ.*** Consequently, the ALJ improperly
> accorded weight to Paula Montgomery's proposed RFC and his
> determination that plaintiff could perform "a wide range of unskilled work
> at a light exertional level" (Tr. 24) is, therefore, not supported by
> substantial evidence. *See*, Collins v. Astrue, 2010 WL 2573510, * 4 (S.D.
> Ala. June 22, 2010)("The elimination of the Cardiologist's conclusions left
> the ALJ with an RFC which has only support from a non-examining, non-
> medical source [which] 'alone does not constitute substantial evidence to
> support an administrative decision'."), quoting, Swindle v. Sullivan, 914
> F.2d 222, 226 n .3 (11th Cir. 1990).

2010 WL 3211151at  *8 (emphasis added).  Similarly, there is no evidence in this case

that either an examining or reviewing medical source supports the RFC imposed by the

ALJ.   Consequently, the ALJ's RFC assessment is not supported by the requisite

substantial evidence and the case must, therefore, be remanded for further proceedings.[19]

**(2)   Whether the ALJ's erred by failing to find that Packer suffers from the additional severe impairments of degenerative joint disease of the right knee and varicose veins.**

Packer also argues that the ALJ erred in failing to find that the degenerative changes in her right knee (Tr. 232) and her varicose veins were additional severe impairments.  In view of the Court's conclusion that this case must be remanded, it is unnecessary for the Court to address this issue.

CONCLUSION

For the reasons stated above, it is **RECOMMENDED** that the decision of the Commissioner of Social Security denying plaintiff's benefits be **REVERSED** and the case **REMANDED** for further proceeding not inconsistent with this decision.

In light of the foregoing, and the plain language of sentence four of 42 U.S.C. § 405(g), the undersigned Magistrate Judge recommends that this cause be reversed and remanded pursuant to sentence four of § 405(g) for further proceedings.  *See* Melkonyan v. Sullivan, 501 U.S. 89, 99-102 (1991)(Discussing distinction between sentence four and sentence six remand under 42 U.S.C. §  405(g).).  A remand pursuant to sentence four of § 405(g) makes the plaintiff a prevailing party for purposes of the Equal Access to Justice

---

[19] Packer also seeks to have this Court declare that the ALJ in this case was bound by the finding of the ALJ in a prior unfavorable decision dated November 19, 2008, in which the ALJ determined that Packer could perform no more than sedentary work because of her varicose veins, osteoarthritis of knees and back, and restless leg syndrome.  (Doc. 16 at 10).  Packer cites no authority, however, for the proposition that a prior decision by a different ALJ, concerning a different time period (namely July 20, 2006 through November 19, 2008) and involving different evidence, which was never challenged by Packer either administratively or by judicial review, could have preclusive effect on the case at bar.

Act, 28 U.S.C. § 2412, and terminates this Court's jurisdiction over this matter.  See

Shalala v. Schaefer, 509 U.S. 292, 297 (1993)(A district court remanding a case pursuant

to sentence four of § 405 must enter judgment in the case and may not retain jurisdiction

over the administrative proceedings on remand.)

The attached sheet contains important information regarding objections to this

Report and Recommendation.

**DONE** this   11th   day of September, 2012.

/s/ Katherine P. Nelson
KATHERINE P. NELSON
UNITED STATES MAGISTRATE JUDGE

RIGHTS AND RESPONSIBILITIES FOLLOWING
RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

    1.  **Objection**.  Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(en banc).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within [fourteen] days[20] after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

    A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

    2.  **Transcript (applicable where proceedings tape recorded).**  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

    **DONE** this   11th day of September, 2012.

                    /s/ Katherine P. Nelson
                    **UNITED STATES MAGISTRATE JUDGE**

---

[20] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition [.]"  Fed. R. Civ. P. 72(b)(2).